By the Court.—Van Vorst, J.
In this case the defendants seek to avoid liability for a failure to deliver personal property, in pursuance of an alleged sale thereof to the plaintiffs, upon the ground that they were not the owners thereof, and had no authority to sell it, and that the sale was made through a mistake on their part, as to the identity of the article.
The sale was made through a broker who represented the defendants, and who delivered to the parties respectively a bought and sold note. But the defendants distinctly ratified the transaction by writing their approval thereof on the note. The contracts of sale described the subject thereof as follows: “Fourteen hundred and six *415 (1406) bags (more or less) soft red blood, in usual good order and condition, like sample, to be delivered from Lawrence & Co.’s stores, foot of Water street.” The agreement for the sale was made on the 9th day of Hay, 1883. At that time, the defendant, in fact, had no such merchandise for sale as is described in the contract. They neither owned themselves, nor had they any authority from others, to sell such merchandise.
‘1 Soft red blood ” is an ammoniacal preparation well known in commerce. It is used as a fertilizer. At the time of this sale, the defendants had 1406 bags of an ammoniacal preparation called “burnt leather,” for sale, on account of the Park Bank. It was stored in Lawrence & Co.’s worehouse. In the same warehouse in which the “burnt leather”- was stored, there were 1900 bags of “soft red blood,” belonging to the Manhattan Bank. With this latter article the defendants had nothing to do.
The Park Bank instructed the defendants to sell the 1406 bags of ammoniacal material belonging to them, and they placed the matter in the hands of their broker, who, through some mistake, drew samples from the merchandise of the Manhattan Bank, instead of that belonging to the Park Bank. The samples were drawn from the bags of “ soft red blood.” The broker exhibited these samples to the plaintiff, who purchased the quantity mentioned in the contract, at $2.50 per ton. The purchase was made by the plaintiffs in good faith. They needed the article which the sample exhibited to them represented.
The plaintiffs, shortly after the delivery of the bought and sold notes, demanded the merchandise, and failing to secure it, towards the close of the month, purchased in the market a quantity of it, at an advance over and above the price named in the contract.
There was evidence offered, and received, upon the trial, that the market value of this description of merchandise advanced, during the month of May, after the contract of sale was made.
It is argued by the learned' counsel for the appellants *416 that no valid contract of sale was made, that the subject-matter of the sale, 1406 bags, etc., “like the sample shown,” did not exist—that the minds of the party.did meet.
It is not necessary to question the proposition that assent is indispensable to the validity of a contract. There is no sale, unless the minds of the parties agree as to the subject-matter thereof. There is no evidence that the minds of these parties were not in accord as to,the subject-matter of this sale. The defendants’ brokers offered to the plaintiffs samples of a particular kind and character of merchandise, distinct and peculiar. The plaintiffs needed in their business such merchandise, and they accepted the proposition to purchase it. The terms were agreed upon. The subject-matter of the sale was exactly described in the written contract, which the defendants themselves, having read, approved. Can it be claimed that they did not mean to sell 1406 bags “ soft red blood ” when they signed the contract ? The papers distinctly advised them not only as to what the plaintiffs had agreed to buy, but also what they proposed to sell. Their minds, therefore, agreed as to the identity of the sub j ect-matter.
In the absence of fraud, or of a mutual mistake, an agreement, signed by the parties, where the subject of the sale is plainly described, is of itself the best evidence of assent. Where the words are ambiguous, or may be taken in a different sense, by the parties, parol evidence might be allowed, as to the sense in which they were understood by the parties. But none of these elements exist in this case. Between the parties the transaction was honest, and each understood the contract as it expressed itself. We are not to overlook that fact.
Had the subject-matter been described differently in the two notes, then there would have been no assent.
In the case of Thornton v. Kempton (5 Taunt. 786), cited among others by the appellants’ counsel, the broker, who represented both parties, negotiated a sale, but by *417 mistake described the subject of the sale differently in the bought and sold note. There was no assent. The case of Cutts v. Guild (57 N. Y. 229), also cited by appellants’ counsel, illustrates a case of fraud, or mutual mistake as. to the subject-matter.
In this case, the defendants, relying upon the representations and action of their broker, believed that the description contained in the contract, which they distinctly approved, covered the merchandise belonging to-the Park Bank, which they had been authorized to sell.. But of the defendants’ belief or intentions in this regard, other than is expressed in the written contract, the plaintiffs were entirely ignorant. They contracted upon the faith of the samples, and the description - of the subject matter, as prepared by their broker. Upon these facts, they were justified in relying. The law regards only expressions of intention which are communicated, in, determining the validity of contracts. When the mistake-is that of one party alone, the rule of law is, that whatever a man’s real intention may be, if he manifests an intention to another party so as to induce that other party to act upon it, in making a contract, he will be estopped from denying that the intention, as manifested, was his; real intention (Benj. Sales, § 55, and cases cited in note).
It is also argued by the counsel for the appellants,, that the defendants had neither title nor possession of the-goods in question, that there was no warranty of title,, express or implied, and that having no title, and not being-authorized to sell the property in question, they could not give a title. The subject of an implied warranty, in the absence of one that is express, upon the sale of personal property, has been much discussed in the courts. The question has, however, chiefly arisen between the purchaser from a person without title, where the former has been sued by the true owner for its conversion. Such was the case of Burt v. Dewey (40 N. Y. 283), where a stolen horse had been sold. In that case, the rule was stated, that when a vendor at the time of sale was in *418 possession, a warranty of title is implied. The legal question in that case was, however, one of damages. In O’Brien v. Jones (91 N. Y. 193), there was evidence of express warranty. In the early case, McCoy v. Quackenbon (3 Barb. 323), it is stated, Judge Amasa J. Parker writing the opinion of the court, “that upon this point, there has been some conflict of opinion, and the question not being judicially settled in this state, it is necessary to give it a careful examination.” From such examination the result reached by the court was, “ the possession of a chattel by a vendor is equivalent to an affirmation of title, and in such case the vendor is to be held to an implied warranty of title, but if the property sold be, at the time of the salé, in the possession of a third person, no warranty of title will be implied. ” In another part of the opinion, the judge says, “the intent and understanding of the parties must be sought from all the circumstances of the transaction. ” In the case last cited, the action was to recover for a breach of a warranty of title on the sale of a promissory note, which was not at the time of sale in the possession of the vendors. The plaintiff failed in the end to recover, for it distinctly appeared that there were circumstances showing that the plaintiff had been advised before he purchased, of the vendor’s doubts about his property in the note, and that he purchased the “ note at his own risk.” Under such circumstances there could have been no implied warranty.
In the case under consideration, the defendants’ broker had in his possession the samples represented to be drawn from the bulk of the merchandise described in the contract of sale. These samples stood in the place of the bulk. Constructively, that was a sufficient possession of the bulk, to authorize the plaintiffs to believe, and to act upon the belief, that the defendants were actually in possession of the bulk. That would be a sufficient possession to give rise to the implication of title in the defendants.
It may be, as is argued by the appellate court, that the plaintiffs could not have had a decree for a specific per *419 formance of this contract; but an inability to get such relief affords no reason for not awarding damages in an action at law, where a cause of action at law in fact exists.
It may also be true, that the defendants, upon allegations of the mistake of their broker and themselves, could have had a rescission of the contract, but such judgment could only have been had upon indemnifying the purchasers from actual loss. For he that would have equity must do equity.
The consequences of the defendants’ mistake should not be borne exclusively by the vendees. If the plaintiffs have in fact sustained loss, through the defendants’ mistake, the loss should fall upon the defendants.
The appellants’ counsel urge that the damages should have been nominal, only. In Burt v. Dewey (40 N. Y. 283), it was held in substance, that where no damages had been actually sustained, the recovery of damages should be nominal.
The learned judge, upon the trial of this action, limited the damages to the difference between the market value of the merchandise during the month after the breach, and the price fixed by the contract. Under the evidence, that direction truly measured the plaintiffs’ loss, and nothing more. Several demands were made by the plaintiffs upon the defendants for the merchandise. A written demand was finally made on May 2Í. Then, at least, it was distinctly announced to the plaintiffs, that a mistake had occurred, and that the merchandise could not be delivered. After that, as already stated, the plaintiffs purchased from others, at the market value, which was in excess of the price fixed by the contract. In June following, the defendants tendered the merchandise described in the contract, but such tender came too late, and was properly refused.
We have looked with care over all the exceptions taken by the appellants’ counsel during the trial, and do not find that either of them can be sustained.
*420 The case appears to have been well and. considerately tried by the learned judge. We do not think that the defendants, upon the whole case, can well complain of the rulings.
There was, however, one ruling, which at first blush appeared to be erroneous, growing out of the disposition made of the defendants’ offer to prove that “ the value of the particular bags of soft blood,” mentioned in the contract, the market value during the whole month of May, was not greater than $2.50 per ton. The judge denied the offer and request, upon the ground.that the “contract fixes the price.” It is true that it was not proper to prove the market value as it existed on the day the contract was made, but it was material to show what such value was after the breach, during the rest of the month. But whatever injury the defendants sustained by this ruling, was completely repaired afterwards, for evidence was allowed to be given upon the precise point by the defendants.
In the end, there was a conflict as to the market value of the merchandise, after the breach.
There seemed to be two grades of this merchandise, one of which was “prime quality.” The defendants claimed that the article described in the contract, according to the samples, was of an inferior grade.
One of the defendants testified that he was familiar with the prices of these goods, in May, 1883. He said: “ there was a difference of about ten per cent, in the market value of the goods of this sample, compared with the market value of goóds of prime quality. The goods of this sample were worth about ten per cent, less than prime goods.” There was other evidence of the same kind. The learned judge distinctly charged, that if the jury “believe that the goods like the sample shown to the plaintiffs,” were only worth $2.50 per ton, during the month of May, then the defendants are entitled to a verdict.
*421 The judgment and order appealed from are affirmed, with costs.
Sedgwick, Oh. J., concurred.